## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------- x

In re:                                                          :      Chapter 11
                                                                :
THE SCOOTER STORE HOLDINGS, INC., *et al.*,[1]                  :      Case No.  13-_____ (___)
                                                                :
        Debtors.                                           :      Joint Administration Requested
                                                                :

----------------------------------------------------------------- x

## DECLARATION OF CHARLES LOWREY OF THE
## SCOOTER STORE HOLDINGS, INC. IN SUPPORT OF DEBTORS'
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: The SCOOTER Store Holdings, Inc. (7246); The SCOOTER Store – Albuquerque, L.L.C. (3265); The SCOOTER Store – Atlanta, L.L.C. (9883); The SCOOTER Store – Austin, Ltd. (4716); The SCOOTER Store – Baltimore, L.L.C. (9884); The SCOOTER Store – Baton Rouge, L.L.C. (9886); The SCOOTER Store – Birmingham, L.L.C. (9887); The SCOOTER Store – Boca Raton, L.L.C. (9889); The SCOOTER Store – Boston, L.L.C. (9893); The SCOOTER Store – Charleston, L.L.C. (9894); The SCOOTER Store – Charlotte, L.L.C. (9902); The SCOOTER Store – Chicago, L.L.C. (2368); The SCOOTER Store – Concord, L.L.C. (9906); The SCOOTER Store – Dallas, L.L.C. (4717); The SCOOTER Store – Dayton, L.L.C. (8678); The SCOOTER Store – Denver, L.L.C. (9909); The SCOOTER Store – Des Moines, L.L.C. (1260); The SCOOTER Store – Detroit, L.L.C. (2358); The SCOOTER Store – Grand Rapids, L.L.C. (1291); The SCOOTER Store – Green Bay, L.L.C. (1832); The SCOOTER Store – Greenville, L.L.C. (9911); The SCOOTER Store – Hartford, L.L.C. (9912); The SCOOTER Store – Houston, Ltd. (4718); The SCOOTER Store – Indianapolis, L.L.C. (8684); The SCOOTER Store – Jackson, L.L.C. (9914); The SCOOTER Store – Jacksonville, L.L.C. (9916); The SCOOTER Store – Kansas City, L.L.C. (8655); The SCOOTER Store – Knoxville, L.L.C. (9921); The SCOOTER Store – Las Vegas, L.L.C. (0038); The SCOOTER Store – Levittown, L.L.C. (9926); The SCOOTER Store – Lincoln, L.L.C. (N/A); The SCOOTER Store – Little Rock, L.L.C. (6425); The SCOOTER Store – Los Angeles, L.L.C. (1294); The SCOOTER Store – Louisville, L.L.C. (9930); The SCOOTER Store – Lubbock, Ltd. (4720); The SCOOTER Store – Madison, L.L.C. (1829); The SCOOTER Store – Minneapolis, L.L.C. (9932); The SCOOTER Store – Mobile, L.L.C. (1466); The SCOOTER Store – Nashville, L.L.C. (9939); The SCOOTER Store – Oklahoma City, L.L.C. (6430); The SCOOTER Store – Orlando, L.L.C. (9943); The SCOOTER Store – Paterson, L.L.C. (9949); The SCOOTER Store – Philadelphia, L.L.C. (9945); The SCOOTER Store – Phoenix, L.L.C. (9950); The SCOOTER Store – Pittsburgh, L.L.C. (9952); The SCOOTER Store – Portland, L.L.C. (1922); The SCOOTER Store – Raleigh Durham, L.L.C. (6134); The SCOOTER Store – Richmond, L.L.C. (8676); The SCOOTER Store – Rochester, L.L.C. (9954); The SCOOTER Store – Sacramento, L.L.C. (1298); The SCOOTER Store – Salt Lake City, L.L.C. (1921); The SCOOTER Store – San Antonio, Ltd. (4724); The SCOOTER Store – San Diego, L.L.C. (1296); The SCOOTER Store – San Francisco, L.L.C. (1293); The SCOOTER Store – Schenectady, L.L.C. (9958); The SCOOTER Store – Seattle, L.L.C. (1918); The SCOOTER Store – Shreveport, L.L.C. (9961); The SCOOTER Store – Springfield, L.L.C. (1834); The SCOOTER Store – St. Louis, L.L.C. (6975); The SCOOTER Store – Toledo, L.L.C. (8681); The SCOOTER Store – Tulsa, L.L.C. (6436); The SCOOTER Store – West Virginia, L.L.C. (8672); The SCOOTER Store – Wichita, L.L.C. (N/A); The SCOOTER Store – Wilkes-Barre, L.L.C. (9962); The SCOOTER Store, Inc. (7905); The SCOOTER Store – USA, Inc. (0608); The SCOOTER Store – Development, L.L.C. (5073); The SCOOTER Store Financial Services, L.L.C. (5481); The SCOOTER Store Aviation, L.L.C. (7185); TSS Management Company, Inc. (4241); TSS Investments, Inc. (4242); and The Scooter Store, Ltd. (0039).  The Debtors' mailing address is 1650 Independence Drive, New Braunfels, Texas 78132.

I, Charles Lowrey, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of The SCOOTER Store Holdings, Inc. ("Scooter"), a corporation organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), Scooter and 71 of its affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.      I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am

---

[2] All capitalized terms used but not otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

4.      The Debtors are a major supplier of power wheelchairs, scooters and related assistance devices for those with mobility limitations. Since their inception in 1991, the Debtors have served over 700,000 senior citizens and disabled persons nationally through a variety of full scale services, including complex rehab solutions, in-home visitations and additional permanent home care solutions.

5.      As discussed in further detail below, structural challenges within the Debtors' pre-petition business model, combined with changes to various healthcare laws have hampered the Debtors' ability to maintain their commercial viability which in turn has led to significant financial distress for the Debtors. In addition, government investigations of the Debtors have created significant financial burdens as well as damaged the Debtors' commercial appeal. The combination of these factors has led to the financially precarious position in which the Debtors currently find themselves.

6.      In consultation with their professionals and after careful examination by the Debtors' board of directors, the Debtors determined that, rather than continue to pursue temporary forbearances, chapter 11 would provide the necessary tools to preserve asset value and accomplish a meaningful restructuring. Through these chapter 11 cases, the Debtors intend to implement an efficient public sale process to preserve their going-concern operations and maximize value for their creditors and estates.

## GENERAL BACKGROUND

**A.      The Debtors' Business and Overview**

7.      The Debtors are leading suppliers of power mobility solutions, including power wheelchairs, scooters, lifts, ramps and accessories. The Debtors also provide, in select markets, certain home care solution services.  The Debtors' products provide customers (generally disabled persons and/or the elderly) with potential alternatives to living in nursing homes or other assisted-care facilities.

8.      Founded in 1991, the Debtors are located in New Braunfels, Texas, with a national network of specialists and locations in 48 states.  The Debtors have helped over 700,000 people with limited mobility – more than any other provider in the United States. The Debtors previously employed over 2,400 employees. As of the Petition Date, the Debtors employed approximately 300 employees.

9.      Throughout their history, the Debtors have continually adapted and striven to improve available services. In 2007, Scooter founded a complex rehab division to help clients unable to rely on standard power mobility equipment to meet their individual and unique mobility needs, providing customized complex rehab solutions supported with nationwide service and a network of seating specialists. This division has become one of the largest complex rehab providers in the country. In 2010, Scooter formalized an internal home case equipment division to better service beneficiaries with chronic medical conditions that require additional types of home care equipment, supplies and accessories in their homes.

10.      In February 2011, a majority voting interest in the Debtors was purchased by affiliates of private equity firm Sun Capital Partners ("Sun"), coincident with an investment in indebtedness of Scooter.  At present, Sun owns indebtedness, preferred equity, and warrants to

purchase 2,009,800 shares of common stock, representing a 66.82% voting ownership interest in the Debtors.

11.     As a provider of health care products, the Debtors are involved in a heavily regulated industry and have extensive compliance and other relationships with Federal and State government agencies, including the Centers for Medicare and Medicaid Systems, the Department of Justice and the Office of the Inspector General.

12.     The Debtors occupy 57 distribution centers in 41 states, and also lease numerous other offices, retail stores and other real estate.  The Debtors do not own any real property, and are tenants under leases for approximately 60 locations.

**B.     The Debtors' Capital Structure**

13.     As discussed in greater detail below, the Debtors' capital structure consists of a first lien revolving credit facility (the "First Lien Facility"), a second lien term loan facility (the "Second Lien Facility", and a third lien term loan facility (the "Third Lien Facility"; each of the First Lien Facility, the Second Lien Facility and the Third Lien Facility, a "Credit Facility," and collectively the "Credit Facilities"). In addition, prior to the Petition Date, the Debtors entered into that certain Security Agreement, dated as of June 14, 2012, in favor of Pride Mobility Products Corporation ("Pride") pursuant to which the Debtors granted a security interest in and lien on certain inventory and proceeds thereof to secure certain obligations of the Debtors to Pride (the "Pride Obligations").

14.     Each of the First Lien Facility, the Second Lien Facility, the Third Lien Facility and the Pride Obligations are subject to separate intercreditor agreements (each an "Intercreditor Agreement," and collectively the "Intercreditor Agreements"), which set forth the respective priorities of the Credit Facilities and the Pride Obligations.

i.      **First Lien Facility**

15.     Certain of the Debtors are parties to that certain Second Amended and Restated First Lien Loan and Security Agreement, dated as of May 17, 2011 (the "First Lien Loan Agreement"), with CIT Healthcare LLC as First Lien Agent for the lenders. This facility includes revolving loans with a maximum availability of $25,000,000.  The First Lien Facility is set to mature on August 1, 2015, and pursuant to the terms of the First Lien Loan Agreement and the Intercreditor Agreements, is secured by a first lien on substantially all of the Debtors' assets. On or about March 13, 2013, the obligations owed under the First Lien Loan Agreement were purchased by Crystal Financial LLC, which also replaced CIT Healthcare LLC as First Lien Agent at such time.

ii.     **Second Lien Facility**

16.     Certain of the Debtors are parties to that certain Second Lien Loan and Security Agreement, dated as of May 17, 2011 (the "Second Lien Loan Agreement"), with Crystal Financial LLC as Second Lien Agent.  The Second Lien Facility consists of term loans in the amount of $25,000,000.  The Second Lien Facility is set to mature on August 1, 2015, and, pursuant to the terms of the Second Lien Loan Agreement and the Intercreditor Agreements, is secured by a lien on substantially all of the Debtors' assets.

iii.    **Third Lien Facilities**

17.     Certain of the Debtors are parties to that certain Amended and Restated Senior Subordinated Term Loan and Security Agreement, dated as of May 17, 2011, as amended, with Sun Scooter Store Finance, LLC.  The Third Lien Facility consists of term loans in the principal amount of $40,000,000.  The Third Lien Facility is set to mature on February 1, 2016, and is secured by a lien on substantially all assets.  Pursuant to the Intercreditor Agreements, the

liens granted under the Third Lien Facility are subordinate to the liens granted under the First

Lien Facility and the Second Lien Facility.

      **iv.**        **Forbearance Agreements**

      18.      Due to current financial impairments, the Debtors are currently in default

under each of the Credit Facilities and have worked with the Administrative Agents under each

Credit Facility to reach a consensual resolution. On March 13, 2013, the Debtors entered into

forbearance agreements with respect to each of the Credit Facilities (as amended on March 29,

2013, the "Forbearance Agreements")[3], which provide for a forbearance period through April 21,

2013.

**C.**      **The Debtors' Prepetition Organization Structure**

      19.      The Debtors comprise 72 entities. Scooter is the direct parent to The

Scooter Store, Inc. (f/k/a/ TSSI, Inc.) and The Scooter Store – USA, Inc., and there are an

additional 69 indirect subsidiaries of Scooter. An organizational chart is attached hereto as

Exhibit A.  As noted previously, affiliates of Sun now hold the ultimate controlling voting

interest in the Debtors.

**EVENTS LEADING TO THE CHAPTER 11 CASES.**

      20.      Over the course of the last few years, several factors have contributed to

the Debtors need to file these chapter 11 cases, including, most notably, challenges inherent in

the Debtors' business model, combined with changes to health care laws in the United States and

a series of government investigations, the combination of which has placed significant strain on

the Debtors' business, liquidity and ability to satisfy covenants under the various Credit

Agreements, ultimately leading to the filing of these chapter 11 cases.

---

[3] The Debtors also previously entered into Forbearance Agreements on December 19, 2012, with respect to each of the Credit Facilities.

**A.**     **The Debtors' Business Model and Changes to Healthcare Laws in the United States**

21.     In recent years, changes to various health care laws and regulations have ultimately had a severe negative impact on the Debtors' operations and ability to continue as a viable business. In 2011, the majority of the Medicare business switched to a 13-month capped rental model with respect to collection of payments on mobility devices.  Complying with this change created financial challenges for the Debtors, in particular because the Debtors' business model which dedicated a significant portion of its available liquidity to advertising expense, did not possess sufficient flexibility and resiliency to withstand the change in timing and method of payment; this had a ripple effect resulting in significant negative impacts to the Debtors' ability to continue operating.  Initially, this change in timing of collections resulted in a negative effect on the Debtors' cash flow.  This decline to the Debtors' cash flow created additional challenges for the Debtors under their First Lien Facility, which in turn placed the Debtors under additional financial hardship, causing the Debtors to miss certain debt covenants under the First Lien Facility. The Debtors took efforts to replace their First Lien Facility, but ultimately were unsuccessful. Combined with an already suffering economy, the Debtors have been unable to adapt as promptly as needed to the new regulatory environment while under severe financial hardship.

**B.**     **Government Investigations**

22.     In addition to the challenges posed by the Debtors' business model and by changes in various health care laws, the Debtors' business has been disrupted due to the Debtors being subject to several government investigations which have imposed both significant financial burdens on the Debtors and damaged their brand and commercial appeal. The Debtors were recently subject to a criminal investigation by the Department of Justice with a focus on certain

individuals from the Debtors' former management team. This investigation not only created

negative publicity for the Debtors, but also contributed to the Debtors' difficulty in obtaining

new financing.

23.    In addition, the Debtors have been subject to a civil investigation related

to the Debtors' former business practices, including billing and reimbursement procedures. As

with the criminal investigation, the Debtors have been working with the Department of Justice

and the Department of Health and Human Services Office of the Inspector General to provide the

requested information.  Finally, the Debtors are responding to inquiries and actions by the

Accreditation Commission for Healthcare ("ACHC"), the organization that provides required

accreditation of a portion of the Debtors' business activities.  As of the Petition Date, the

Debtors, by and through their recently elected Chief Restructuring Officer, are fully cooperating

with the government in its investigations and with ACHC in its inquiries. Nonetheless, the

government investigations have caused the Debtors to undergo additional financial hardship and

negative commercial exposure, contributing to the need to file these chapter 11 cases.

C.    **The Debtors' Prepetition Restructuring Negotiations**

24.    The combination of the financial and commercial damage resulting from

changes to healthcare laws and government investigations has made it increasingly difficult for

the Debtors to service their debt obligations. As discussed above, the Debtors have entered into

the Forbearance Agreements in order to obtain time to explore different paths to a successful

restructuring.

25.    On March 15, 2013, the Board of Directors of Scooter unanimously

approved the appointment of Lawrence Young as Chief Restructuring Officer of Scooter to

oversee the restructuring process. After careful review, the Debtors, in consultation with their

advisors, determined that a chapter 11 filing was the best and most efficient way to create the

greatest return for the Debtors, their estates, and all parties-in-interest. Through a chapter 11

filing, the Debtors will be in the best position to efficiently maximize the value of the Debtors'

estates.

**D.**      **Proposed Sale of Substantially All Assets**

26.      As noted above, the Debtors intend to pursue a sale of substantially all of

their assets pursuant to section 363 of the Bankruptcy Code.  The Debtors have determined in

consultation with their advisors that the value of the Debtors' estates may be worth more as a

going concern than in liquidation.  The Debtors proposed sale of substantially all of their assets

can therefore not only preserve the value of the Debtors' businesses but also maximize such

value for the Debtors' creditors and estates.  The Debtors have included as an exhibit to the

proposed DIP Order (as such term is defined below) a series of milestones (the "Reorganization

Milestones") related to a proposed sale of the Debtors' assets.  The Reorganization Milestones

consist of a proposed timeline by which the Debtors intend to complete any proposed sale

transaction under section 363 of the Bankruptcy Code.  Subject to approval of the Court, the

Reorganization Milestones have a proposed bid deadline of July 23, 2013, with an auction on

July 25, 2013 and a closing on the sale on or before July 30, 2013.  To assist in implementing

this sale process, the Debtors have engaged the investment bank Morgan Joseph TriArtisan.  The

Debtors intend to implement an efficient public sale process to preserve their going-concern

operations and obtain the most value for their creditors and estates, and any sale under section

363 of the Bankruptcy Code will be at arm's-length and conducted in an open and transparent

manner.

**FIRST DAY MOTIONS**

27.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each First Day Motion be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officer and advisors.

A.    **Motion for Entry of an Order Directing Joint Administration of the Debtors' Related Chapter 11 Cases**

28.    By this motion (the "Joint Administration Motion"), the Debtors seek the entry of an order, pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, consolidating the chapter 11 cases for procedural purposes only.  Many of the motions, applications, hearings and orders that will arise in these chapter 11 cases will jointly affect each Debtor.  For this reason, the Debtors respectfully submit that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these chapter 11 cases.  In order to optimally and economically administer the Debtors' pending chapter 11 cases, the Debtors submit that such cases should be jointly administered, for procedural purposes only, under the case number assigned to Scooter.

29.    The Debtors also request in the Joint Administration Motion that the Clerk of the Court maintain one file and one docket for all of the Debtors' chapter 11 cases, which file and docket shall be the file and docket for Scooter.

30.     I have reviewed the Joint Administration Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.     Application of the Debtors for an Order Authorizing and Approving the Appointment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S. C. § 156(c), Section 105(a) of the Bankruptcy Code, Bankruptcy Rule 2002(f) and Local Rule 2002-1(f)**

31.     By this application (the "Epiq Application") the Debtors request entry of an order appointing Epiq Bankruptcy Solutions, LLC ("Epiq") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' cases.  The Debtors' selection of Epiq to act as the claims and noticing agent satisfies the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.  The terms of retention are set forth in the Engagement Agreement annexed as Exhibit A to the Epiq Application; provided, however, that Epiq is seeking approval solely of the terms and provisions as set forth in the Epiq Application and the proposed order attached thereto.  By separate application, the Debtors intend to seek to retain Epiq as administrative advisor in these chapter 11 cases.

32.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

33.     I have reviewed the Epiq Application and verify that the facts set forth therein are accurate, and I believe the relief requested in the Epiq Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Epiq Application should be approved.

**C.     The Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) Continue Use of Existing Cash Management System, Bank Accounts and Business Forms and (II) Authorizing the Debtors to Open New Debtor-in-Possession Accounts, and (B) Extending the Debtors' Time to Comply With Section 345(b) of the Bankruptcy Code**

34.     By this motion (the "Cash Management Motion"), the Debtors seek entry of interim and final orders authorizing them to:  (a) continue to use their Cash Management System, Bank Accounts and business forms, (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors-in-possession; (c) if appropriate, open new debtor-in-possession accounts and/or close any existing accounts, provided that the Debtors give prior notice to the Office of the United States Trustee for District of Delaware and any official committees appointed in these chapter 11 cases; and (d) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices), and documents related to the Bank Accounts, existing immediately before the Petition Date, without reference to their status as debtors-in–possession.

01:13525065.1

35.     The Debtors further request that the Court authorize and direct the Cash Management Banks to, subject to the Account Control Agreements and the DIP Order: (i) continue to maintain, service and administer such accounts, and (ii) debit the Debtors' accounts in the ordinary course of business on account of:  (a) all checks drawn on the Debtors' accounts that are cashed at the Cash Management Banks or exchanged for cashier's checks by the payees, thereof, prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtor was responsible for such items prior to the Petition Date; and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Cash Management Banks as service charges for the maintenance of the Cash Management System.

36.     I have reviewed the Cash Management Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**D.      Debtors' Motion for Entry an Order Authorizing (I) Payment of Certain Prepetition Taxes and Fees, and (II) Financial Institutions to Process and Cash Related Checks and Transfers**

37.     By this motion (the "Taxes Motion") the Debtors request entry of an order, pursuant to section 105(a) of the Bankruptcy Code:  (i) authorizing, but not requiring, the Debtors to remit and pay sales taxes incurred in connection with the operation of the Debtors' business (collectively, the "Sales Taxes") and business license, permit, and other similar fees or

charges (collectively, the "Fees"), as the Debtors, in their discretion, deem necessary, to various

federal, state, county and municipal taxing and licensing authorities (collectively, the

"Authorities"); and (ii) authorizing financial institutions to receive, process and honor all checks

and electronic payment requests relating to the foregoing.

38.     In the ordinary course of business, the Debtors are required to collect

Sales Taxes from purchasers of their products on a per sale basis and periodically remit the Sales

Taxes to the applicable Authorities.  Typically, Sales Taxes accrue as products are sold, and such

taxes are calculated based on a statutory percentage of the sale price.  The statutory percentage

required to be withheld by each of the Debtors varies by the state and county in which the

Debtors operate.  In addition, certain state and local taxing Authorities require the payment of

Fees for the authority to conduct business within their jurisdictions.  The Fees are typically for

business licenses, permits, and other similar charges and assessments.  Depending on the

jurisdiction, the Debtors remit these Fees on a monthly, quarterly, or annual basis.

39.     As of the Petition Date, the Debtors estimate that approximately $225,000

in Sales Taxes and $15,000 in Fees relating to the prepetition period will be due and owing to the

Authorities in the ordinary course of business.  The Debtors hereby seek authority to pay all

prepetition obligations in respect of the Sales Taxes and Fees owed to the Authorities.

40.     I have reviewed the Taxes Motion and verify that the facts set forth therein

are accurate, and I believe the relief requested in the Taxes Motion is in the best interest of the

Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of

the Debtors, I respectfully submit that the Taxes Motion should be approved.

**E.    Motion for Order Authorizing: (I) Payment of Wages,
Compensation and Employee Benefits; and (II) Financial Institutions
to Process and Cash Related Checks and Transfers**

41.    By this motion (the "Employee Wage Motion"), the Debtors seek entry of

an order:  (i) authorizing, but not requiring, the Debtors to (a) pay, in their sole discretion, all

obligations incurred under or related to the Employee Obligations (as such term is defined in the

Employee Wage Motion) and (b) maintain and continue to honor their practices, programs and

policies for their Employees (as such term is defined in the Employee Wage Motion) as they

were in effect as of the Petition Date and as such may be modified, amended or supplemented

from time to time in the ordinary course of business; and (ii) authorizing the Debtors' financial

institutions to receive, process and honor all checks and electronic payment requests relating to

the  foregoing.

42.    The Debtors believe any delay in payment or failure to continue to honor

the programs and policies comprising the Employee Obligations would cost the Debtors' estates

more than the requested payments due to factors such as the cost of losing an Employee's

knowhow and the cost of replacement of some Employees who would be inclined to accept other

jobs.  Failure to make these payments is likely to impair irreparably the Employees' morale,

dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship

with their Employees at a time when the Employees' support is critical to the Chapter 11 Cases

and sale efforts.  Further, absent the relief requested, the Employees may suffer undue hardship

and, in many instances, serious financial difficulties, as many Employees rely on their wages and

benefits to meet their personal financial obligations.

43.    I have reviewed the Employee Wage Motion and verify that the facts set

forth therein are accurate, and I believe the relief requested in the Employee Wage Motion is in

the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will

enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage Motion

should be approved.

**F.      Motion for Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

44.      By this motion (the "Utilities Motion"), the Debtors seek entry of interim

and final orders (a) prohibiting the Utility Companies from altering, refusing, or discontinuing

Utility Services on account of prepetition invoices that may be unpaid, including the making of

demands for security deposits or accelerated payment terms; (b) providing that the Utility

Companies have "adequate assurance of payment" within the meaning of section 366(b) and (c)

of the Bankruptcy Code, based, inter alia, on the Debtors' establishment of a segregated account

containing an amount equal to 50% of the Debtors' estimated monthly cost of utility service,

which may be adjusted by the Debtors to account for the termination of any of the Utility

Services; and (c) establishing procedures for determining any request for additional adequate

assurance of future payment and authorizing the Debtors to provide adequate assurance of future

payment to the Debtors' utility service providers.

45.      In order to maintain the day-to-day operation of their distribution facilities

(the "Distribution Centers"), the Debtors receive utility services at the Distribution Centers and

their corporate offices.  Such services include electric, electrical interconnection, waste

management and disposal, water, gas, telephone, and data (collectively, the "Utility Services").

The Debtors rely on various utility companies (the "Utility Companies") to obtain the Utility

Services. In general the Debtors have established a good payment history with virtually all of the

Utility Companies and have made payments on a regular and timely basis.  To the best of the

Debtors' knowledge, there are no material defaults or arrearages of any significance with respect

to the Debtors' undisputed Utility Services invoices, other than the payment interruptions that

may be caused by the commencement of these chapter 11 cases.

46.     I have reviewed the Utilities Motion and verify that the facts set forth

therein are accurate, and I believe the relief requested in the Utilities Motion is in the best

interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on

behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**G.     Debtors' Motion for Order (A) Authorizing the Debtors to Honor Certain
        Prepetition Customer Obligations and to Continue Prepetition Customer Programs
        and Practices in the Ordinary Course of Business**

47.     By this motion (the "Customer Programs Motion"), the Debtors seek an

entry of an order authorizing them to continue honoring their refund policies (the "Customer

Programs"), which are targeted to develop and sustain positive reputations in their industry, with

Medicare and commercial insurance carriers, and in the marketplace generally.  In the ordinary

course of business, the Customer Programs are implemented in order to refund customers,

Medicare and commercial insurance carriers in the event a scooter is not delivered, is returned

prior to the expiration of a rental agreement, or is necessitated by certain accounting

discrepancies.

48.     The Debtors believe that immediate entry of an order approving the

Debtors' ability to continue to honor their Customer Programs is necessary to avoid immediate

and irreparable harm to the Debtors and their estates.  The success of these cases, and the value

to be generated by a sale, hinges on the Debtors' maintaining their industry relationships and

marketplace goodwill.  Any delay in honoring the Customer Programs, or discontinuation thereof, would jeopardize the Debtors' ability to maximize value for their estates.  By honoring their prepetition obligations under the Customer Programs, the Debtors will preserve customer relationships for the benefit of all stakeholders, at a minimal cost to the estates.

49.     I have reviewed the Customer Programs Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**H.     Debtors' Motion for:  (i) Order Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Insurance Programs  and (ii) Interim and Final Orders Authorizing Continuation of Insurance Premium Financing Programs**

50.     In connection with the operation of their business, the Debtors maintain general liability, foreign liability, workers' compensation , directors & officers liability, umbrella & excess liability, and various other liability, property, and automobile insurance policies (together with certain surety bonds required in the operation of the Debtors' businesses, the "Insurance Programs") through several different insurance carriers.  By this motion (the "Insurance Motion"), the Debtors seek entry of an order authorizing them to continue their Insurance Programs on an uninterrupted basis, and, to the extent necessary, revise, extend, renew, supplement or change the Insurance Programs in accordance with the same practices and procedures that were in effect before the Petition Date, and to pay all premiums, and other obligations the Debtors (in the exercise of their business judgment) deem necessary to continue the Insurance Programs, arising under or in connection with the Insurance Programs

01:13525065.1

(collectively, the "Insurance Obligations") relating to the periods before and after the Petition Date.  The Debtors also seek an order directing their banks to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their Insurance Obligations.

51.     In addition, pursuant to sections 361, 362, 363 and 363 of the Bankruptcy Code, the Debtors request authority to continue their existing insurance premium financing arrangement and to pay insurance premium financing obligations owed by the Debtors on account of any premium financing program

52.     I have reviewed the Insurance Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**I.      Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Secured Postpetition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 105, 361, 362 and 364, (B) Use Of Cash Collateral Pursuant to 11 U.S.C. § 363, and (C) Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364; and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001**

53.     By this motion (the "DIP Motion"), the Debtors seek entry of an interim and final orders, *inter alia*:

    i.      under Bankruptcy Code §§ 363 and 364, authorizing the Debtors to obtain postpetition financing up to an aggregate principal amount of $7,500,000, with such funds available to pay (i) the fees and expenses (including, without limitation, attorneys' fees and expenses) owed to the DIP Lender, and (ii) other expenditures in accordance with the terms set forth in the Postpetition Agreement and Budget;

    ii.     under Bankruptcy Code § 364(c)(1), granting superpriority claim status to the Postpetition Debt, subject to the terms of the Interim Order;

iii.    under Bankruptcy Code §§ 364(c)(2), (c)(3) and (d), as security for the repayment of the Postpetition Debt, authorizing the Debtors to grant to the DIP Lender, security interests in and liens upon the DIP Collateral, subject only to Permitted Liens;

iv.    under Bankruptcy Code §§ 361, 363(c)(2) and 363(e), and subject to the terms and provisions of the Interim Order and Final Order, authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, and to provide adequate protection with respect to any diminution in the value of the Prepetition Collateral;

v.    under Bankruptcy Code § 362, vacating and modifying the automatic stay to the extent set forth in the Interim Order and Postpetition Agreement;

vi.    pursuant to Bankruptcy Rule 4001, scheduling a preliminary hearing on this Motion and authorizing the Debtors from the entry of the Interim Order until the final hearing (the "Final Hearing") to obtain credit under the terms contained in the Postpetition Agreement and to utilize Cash Collateral on the terms set forth in the Interim Order; and

vii.    pursuant to Bankruptcy Rule 4001, scheduling a Final Hearing on the DIP Motion and establishing notice procedures in respect of the Final Hearing by this Court to consider entry of the Final Order authorizing the Debtors to borrow the balance of the Postpetition Debt on a final basis.

54.    I have reviewed the DIP Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the DIP Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

The foregoing facts are true and correct to the best of my information, knowledge and belief.

April 15, 2013
New Braunfels, Texas

/s/ Charles Lowrey
Charles Lowrey
Chief Financial Officer

01:13525065.1

## **EXHIBIT A**

## **ORGANIZATIONAL CHART**

01:13525065.1



# The SCOOTER Store

**Corporate Organization**



The SCOOTER Store
Holdings, Inc.
Delaware Corp.

The SCOOTER Store, Inc.
f/ka TSSI, Inc.
Nevada Corp.

The SCOOTER Store - USA, Inc.
Nevada Corp.

The SCOOTER Store –
Development, LLC
Texas Single Member LLC

The SCOOTER Store –
Financial Services, LLC
Nevada Single Member LLC

The SCOOTER Store –
Aviation, LLC
Nevada Single Member LLC

TSS Management
Company, Inc.
Nevada Corp.

TSS Investments, Inc.
Nevada Corp.

The SCOOTER Store – City Name, L.L.C.
Nevada Single Member LLC
*This is the structure for all DCs located in states other than Texas*

1% General Partner

99% Limited Partner

50 Active Distribution Centers
8 Inactive Distribution Centers

The SCOOTER Store
-City Name  *, **Ltd.**
Texas Limited Ptnrship

The SCOOTER Store, Ltd.
f/k/a TSS Holdings, Ltd.
Texas Limited Ptnrship

5 Limited Partnerships:

*= Austin / Inactive
Dallas
Houston
Lubbock
San Antonio I (includes New Braunfels DC)

Total number of entities = 72

H-877035.2